(December 16, 2003)

■ PATRICK GUERRAND-HERMÈS et al., Respondents, v J.P. MORGAN & CO. INC. et al., Appellants. [769 NYS2d 240]—

Order, Supreme Court, New York County (Karla Moskowitz, J.), entered January 9, 2003, which, insofar as appealed from, denied defendants' motion for summary judgment to dismiss the causes of action for negligence, breach of fiduciary duty, and breach of contract, as well as plaintiffs' claims for lost profits and punitive damages, unanimously reversed, on the law, with costs, and the causes of action and damages claims dismissed. The Clerk is directed to enter judgment in favor of defendants, dismissing the complaint.

This action arises out of a loan and two brokerage agreements that plaintiff Patrick Guerrand-Hermès, a former vice chairman of the board of directors of Hermès International and an heir of the Hermès family that founded the chain of retail stores bearing their name, acting through plaintiff Midori Holdings Inc. (Midori) as an investment vehicle, entered into with defendants (Morgan). In October 1997, the parties executed a series of loan and pledge agreements pursuant to which plaintiffs borrowed $24 million, secured by up to 300,000 shares of Hermès International common stock and other assets. The loan value was not to exceed 65% of the collateral value. If the loan value reached 70% of the collateral, plaintiffs were obli-

gated, within three days' notice, to provide additional collateral or partially repay the loan in order to restore the 65% ratio; in the event that the loan value reached 75%, Morgan, in its sole discretion, was entitled to sell collateral. Of the $24 million that plaintiffs borrowed, $6 million was taken for use outside Morgan, and $18 million was placed in a discretionary investment account managed by Morgan.

Contemporaneously with the loan agreements, plaintiffs signed an investment management agreement and written investment guidelines, which provided that the $18 million would be invested in a leveraged portfolio of emerging market debt securities. The "objective of the portfolio [was] to earn sufficient cash flow to cover all costs (including interest and fees) incurred by the [$24 million] loan." The investment agreements reiterated that changes in the loan/portfolio ratio could result in Morgan's demand for additional collateral or liquidation of all or a portion of the portfolio. Guerrand-Hermès acknowledged that he had "extensive investment experience," that he understood "the risks (including market, economic and political) associated with investments in emerging markets in a leveraged emerging market portfolio," and that he realized that "the leveraged portfolio may display a high degree of volatility," that "investments in emerging markets debt securities are risky, and that the proposed strategy can lead to losses of principal, including all of the $18 million equity invested, or more." Plaintiffs signed agreements pledging the account funds as collateral. Plaintiffs also expressly waived any conflict of interest that might arise from Morgan's status as both lender and investment manager/advisor. In connection with all the agreements, plaintiffs were represented by attorneys from major law firms, and Guerrand-Hermès consulted with his two sons, who have considerable experience in portfolio management and investments.

Over the course of the following months, the discretionary account declined, and in June 1998 plaintiffs closed that account and transferred the monies to a "self-directed investment" account, still in emerging markets debt securities, and still managed by Morgan, but over which plaintiffs could exercise more control; however, the new account agreement stated that Morgan reserved the right, in its "absolute discretion," to "refuse to undertake any transaction" requested by plaintiffs. The parties executed new loan and pledge agreements, which were substantially the same as the previous agreements, including plaintiffs' acknowledgment of "the risks inherent in reliance on a portfolio of financial assets as collateral for a credit facility."

Between June and September 1998, the value of the Hermès stock plaintiffs had pledged as collateral dropped 35%, prompting Morgan to request $2.5 million in cash or assets to "top up" the collateral. Plaintiffs tendered only $1 million, and Morgan therefore sold securities in the account to bring it in line with the loan/collateral ratio set forth in the parties' agreements. Thereafter, plaintiffs commenced this action, and Morgan moved for summary judgment to dismiss the complaint, which the IAS court granted to the extent of dismissing all causes of action except those for breach of fiduciary duty, negligence, and breach of contract, and plaintiffs' request for lost profits and punitive damages on those claims. The only issue on appeal is the IAS court's partial denial of the motion, and we now reverse to grant the motion in its entirety and dismiss the complaint.

Morgan concedes that it owed plaintiffs a fiduciary duty with respect to the discretionary account, since Morgan possessed discretionary trading authority. To the extent the IAS court found that Morgan also owed a fiduciary duty with respect to the self-directed account, in that Morgan had a conflict of interest arising out of its status as both lender and investment advisor, plaintiffs expressly waived such conflict (*see Schneider v Saiber Schlesinger Satz & Goldstein*, 260 AD2d 321 [1999]). In any event, plaintiffs failed to raise a triable issue of fact whether there was a breach of fiduciary duty.

The IAS court identified three bases for finding an issue of fact regarding the alleged breach of fiduciary duty: (1) Morgan invested the entire discretionary account in high-risk emerging markets debt securities; (2) Morgan wrongfully froze the self-directed account; and (3) Morgan denied plaintiffs' request to transfer the funds in the self-directed account to a hedge fund managed by one of Guerrand-Hermès's sons. With respect to the first contention, the very purpose of the investment strategy, as set forth in the "Objective" section, was to invest in emerging markets debt securities. Plaintiffs acknowledged, in writing, that they had extensive investment experience and they understood the risks involved with investing in emerging markets debt securities, as more fully set forth, *supra*. In fact, plaintiffs affirmed that Morgan was not "responsible for proposing the leveraged portfolio investment strategy" and that they did not rely on Morgan in connection with the investment strategy. Furthermore, plaintiffs expressly agreed to bear any losses.

Concerning the second basis, Morgan's freezing of the self-directed account, that took place only after the Hermès stock declined precipitately and plaintiffs refused to tender the additional collateral in the full amount mandated by the parties'

agreements. Thus, Morgan was contractually entitled to not undertake any further trading in the account until the collateralization ratio was restored.

As to the third basis, that Morgan declined to transfer the funds from the self-directed account to a hedge fund managed by one of Guerrand-Hermès's sons, Morgan had a contractual right to maintain its pledge over the funds, which partially served as collateral for the $24 million loan.

Plaintiffs claim four instances of breach of contract. First, plaintiffs argue that Morgan disregarded plaintiffs' instruction to sell the self-directed account's holdings in the "Galileo Fund." However, Morgan was unable to sell the Galileo Fund because it was subject to a one-year "lock-up" that had not yet expired. Furthermore, the fund appreciated by 30% and thus it is unclear what damages plaintiffs suffered. Plaintiffs' assertion that they never approved the purchase of that investment is belied by the record and their own contradictory statement that they were unaware they were in charge of their own investments in the self-directed account, which claim, in turn, is refuted by the plain language of the written agreement pertaining to that account. The evidence also demonstrates that Morgan informed plaintiffs of the one-year lock-up prior to investing in the fund.

With respect to plaintiffs' argument that Morgan ignored their purchase order for an initial public offering (IPO) of "Swisscom" shares, plaintiffs failed to demonstrate that they ever made a firm request, it is not clear that the IPO underwriter would have allocated the shares to plaintiffs' account, and the account had been frozen at the time plaintiffs claim they made the order.

Next, plaintiffs assert that Morgan declined to follow their directive to sell certain Korean securities. However, those securities were held in the discretionary account, over which Morgan retained trading authority, and Morgan was in compliance with the investment guidelines' diversification requirements.

Morgan was not contractually bound to hedge the discretionary account, and there is no evidence that plaintiffs complained to Morgan about the lack of hedging in the self-directed account.

The cause of action for negligence merely restates the other claims, and is therefore dismissed (see Saint Patrick's Home for Aged & Infirm v Laticrete Intl., 267 AD2d 166 [1999]).

In light of the dismissal of all the causes of action, plaintiffs' claims for lost profits and punitive damages are also dismissed. Concur—Buckley, P.J., Sullivan, Williams and Lerner, JJ.